```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
NEW YORK STATE NURSES ASSOCIATION          :
BENEFITS FUND, through the Chairperson of  :
the Board of Trustees, Dennis Buchanan, and :
the Secretary of the Board of Trustees, Nancy :
Kaleda,                                    :    OPINION AND ORDER
                    Plaintiff,             :
                                           :    17 CV 1899 (VB)
v.                                         :
                                           :
THE NYACK HOSPITAL,                        :
                    Defendant.             :
--------------------------------------------------------------x
```

Briccetti, J.:

Plaintiff New York State Nurses Association Benefits Fund (the "Fund") brings this action to compel defendant The Nyack Hospital ("Nyack" or the "hospital") to submit to an audit and to recover potential unpaid benefits contributions pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq., the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 141, et seq., and the common law of trusts.

Now pending are the Fund's motion for summary judgment (Doc. #58) and Nyack's cross-motion for summary judgment (Doc. #70).

For the reasons set forth below, the Fund's motion is GRANTED IN PART and DENIED IN PART, and Nyack's motion is GRANTED IN PART and DENIED IN PART.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

**BACKGROUND**

The parties have submitted briefs, declarations with exhibits, and statements of material fact pursuant to Local Civil Rule 56.1, which reflect the following factual background.

1

I.      The Parties

Nyack serves the residents of Rockland County and surrounding areas. It has approximately 1,400 full-time and part-time employees. The majority of those employees belong to four unions: the New York State Nurses Association ("NYSNA"), Local 1199 of the Service Employees International Union, Communications Workers of America Local 1103, and Local 30 of the International Union of Operating Engineers.

The Fund is a multiemployer fringe benefit fund governed by ERISA that provides health and welfare benefits to employees of various hospitals and medical facilities that are parties to collective bargaining agreements with NYSNA and have agreed to contribute to the Fund. It is governed by the Second Amended and Restated Agreement and Declaration of Trust Establishing the New York State Nurses Association Benefits Fund (the "Trust Agreement").

II.     The Trust Agreement

Under the Trust Agreement, the trustees must "ensure that the operations of the Fund conform to the applicable requirements of the [LMRA], ERISA, and the Internal Revenue Code of 1986 (the "Code") and other applicable laws and regulations." (Doc. #66 ("Rosetti Aff.") Ex. B ("Trust Agreement") Art. IV § 12).

The Trust Agreement empowers the trustees to "construe the provisions of this Agreement and Declaration of Trust and the terms used herein." (Trust Agreement Art. IV § 2). Further, under the Trust Agreement, "any construction adopted by the Trustees in good faith shall be binding upon the Association, the Employer, and the Employees and their families and dependents." (Id.). The trustees are also authorized to "[t]o do all acts, whether or not expressly authorized herein, which the Trustees may deem [(i)] necessary or proper for the protection of the property held hereunder. . . . [or (ii)] necessary to accomplish the general objective of

2

enabling the Employees to obtain welfare benefits in the most efficient and economical manner." (Id. Art. IV § 3(f) & (g)). Thus, the trustees may institute legal or equitable proceedings to recover payment from defaulting employers. (Id. Art. V § 4(c)). In addition, "The Trustees may, at such times and places as may be appropriate, have an audit made by independent certified public accounts of the payroll and wage records of any Employer in connection with the said Employer Contributions, Employee Contributions, and/or reports." (Id. Art. V § 5).

III. Nyack Agrees to Contribute to the Fund

In April 2014, Nyack and the Fund signed a memorandum of agreement in which Nyack agreed to contribute to the Fund to provide health and welfare benefits for covered employees. Before the Fund would admit Nyack as a contributing employer, the Fund required some modifications to the memorandum of agreement as well as that Nyack submit an acknowledgment of trust to the Fund's Trustees. Nyack agreed to the modifications and signed an acknowledgment of trust. NYSNA and Nyack then signed a new collective bargaining agreement (the "CBA") for the period January 1, 2013, through December 31, 2017.

The CBA covers "all full-time, regular part-time and per diem registered professional nurses employed by the Hospital, including every person lawfully authorized by permit to practice as a registered professional nurse and every person employed in a position which requires a registered professional nurse." (Rosetti Aff. Ex. C (the "CBA") § 1). It excludes all "supervisory, managerial and administrative employees" and "all other employees employed by the Hospital." (Id.). In 2014, NYSNA represented 485 registered nurses, including full-time, part-time, and per diem nurses employed by the hospital; four hundred of those registered nurses worked full or part-time; and sixty-eight registered nurses, according to Nyack, "were not part of the NYSNA bargaining unit." (Doc. #73 ("Rivera Decl.") ¶ 6).

Full-time registered nurses participate in the Fund's health and benefit coverage unless they affirmatively opt out of the plan. Those full-time registered nurses who opt out must provide proof of other insurance; they also receive an "opt out incentive" of $2,400 per year. (CBA § 9.01(C)). Thirty-four full-time registered nurses opted out of the Fund's coverage in 2015.

Part-time registered nurses must affirmatively opt in to the plan and pay a portion of their premium contribution, which requires execution of authorizations to deduct the premium from their paychecks. Forty-nine part-time registered nurses opted into the Fund's coverage in 2015. Both full-time and part-time registered nurses must complete enrollment forms to receive benefits from the Fund.

IV. <u>Payroll Auditing</u>

Every year, the Fund's Accounting Department selects six facilities to audit in the upcoming year. According to the Fund, payroll auditing refers to when a fund engages an auditor to perform agreed-upon procedures (between the fund and the auditor) to ascertain whether employers are making contributions for all eligible participants. Moreover, according to the Fund, it also allows the auditor to gather material to support the CPA's opinion in the annual independent audit of financial statements for the plans.

The auditors perform such an audit pursuant to "agreed-upon procedures" ("AUP"): the fund dictates the scope of the audit and then works with the auditors to determine the procedures and sample size. When it comes to payroll auditing, the auditors are "tasked with reviewing and verifying the monies owed to and paid to a fund by contributing employers on behalf of their covered employees, and to verify the accuracy of the information in the reports submitted to the

fund by those employers." (Rosetti Aff. ¶ 16). The auditors compare the information in the employer's contribution reports submitted to the fund to the employer's payroll records.

The auditors then prepare a report with their findings. According to the Fund, the auditor may not disclose underlying confidential information to anyone, even to the Fund. The report discloses any omissions—i.e., "people for whom contributions were not made, but whom the auditor has reason to believe are eligible participants for whom contributions should have been made"—and instances in which the employer contributed for participants who are no longer in the Fund. (Rosetti Aff. ¶ 39). However, the Fund avers the report "does not contain any information on people whom the auditor believes are not eligible to be participants of the Fund." (Id.).

V.      The Fund Seeks to Audit Nyack

On May 12, 2016, the Fund notified Nyack it had been selected for a payroll audit for 2015 and that the Fund's auditors, UHY LLP, would contact the hospital to arrange to review "payroll and related data." (Rosetti Aff. Ex. F). As Nyack was involved in litigation with UHY LLP, the Fund subsequently engaged Buchbinder, Tunick & Company LLP ("Buchbinder") to conduct the audit instead of UHY LLP. Buchbinder's engagement letter states: "This engagement is solely to assist [the Fund] in evaluating the accuracy and completeness of [Nyack's] monthly contribution reports, including the extent of compliance with the Fund contribution requirements in the [CBA] between [Nyack] and [NSYNA]." (Rosetti Aff. Ex. N).[1]

Nyack agreed to provide payroll records for the registered nurses who are part of the collective bargaining unit. However, Nyack refused to provide the payroll information of all of

---

[1] Nyack contends Buchbinder was engaged to conduct an AUP rather than audit, as that term is generally understood in accounting. The difference is immaterial here, and the Court refers generally to an audit throughout this Opinion and Order.

5

the hospital's employees. The Fund offered to sign a confidentiality agreement, but Nyack did not relent.

## DISCUSSION

I.  Standard of Review

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A fact is material when it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010) (citation omitted). It is the moving party's burden to establish the absence of any genuine issue of material fact. Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party has failed to make a sufficient showing on an essential element of his case on which he has the burden of proof, then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. at 323. If the non-moving party submits "merely colorable" evidence, summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249–50. The non-moving party "must do more than simply show that there is some metaphysical doubt as to

the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (internal citations and quotation omitted). The mere existence of a scintilla of evidence in support of the non-moving party's position is likewise insufficient; there must be evidence on which the jury could reasonably find for him. Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party. Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). If there is any evidence from which a reasonable inference could be drawn in favor of the non-moving party on the issue on which summary judgment is sought, summary judgment is improper. See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir. 2004).

In deciding a motion for summary judgment, the Court need only consider evidence that would be admissible at trial. Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 746 (2d Cir. 1998).

II. Scope of the Audit

Nyack concedes the Fund is entitled to conduct an audit. However, the parties dispute the proper scope of the audit. The Fund argues it is entitled to examine the payroll records of all of Nyack's employees. Nyack argues the Fund is entitled to the payroll records only of registered nurses who are part of the collective bargaining unit.

For the following reasons, the Court finds the Fund is entitled to the payroll records of all registered nurses—including those not in the collective bargaining unit—but not to the payroll records of any other employees at the hospital.

A.   Legal Standard

Trustees of an ERISA multiemployer benefit plan derive the right to audit a participating employer from two sources: contractual and common law. Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc., 472 U.S. 559, 568 (1985) ("Central States") (contractual); New York State Teamsters Conference Pension and Ret. Fund v. Boening Bros., Inc., 92 F.3d 127, 132 (2d Cir. 1996) ("New York State Teamsters") (common law). Indeed, the Second Circuit has held the authority to audit is "crucial" to the trustees' "fundamental duty to locate and take control of fund property." Jaspan v. Glover Bottled Gas Corp, 80 F.3d 38, 41 (2d Cir. 1996).

However, even when authorized contractually or under common law, the right to audit is not unlimited—indeed, trustees may not abuse that right. New York State Teamsters, 92 F.3d at 133. Rather, the trustees may "conduct an audit that is no broader in scope than necessary to achieve its objective and no more extensive than the scope of the trustees' authority." Id. at 134. Thus, an audit request would be "illegitimate" if it were (i) "actually an effort by plan trustees to expand plan coverage beyond the class defined in the plans' terms," (ii) an effort "to acquire information about the employers to advance union goals," (iii) "clearly wasteful of plan assets," or (iv) "unrelated to legitimate plan concerns." Central States, 472 U.S. at 571 n.12.

In Central States, the Supreme Court upheld the right of multiemployer pension fund trustees to conduct an audit involving records for employees who the employer contended were not plan participants. 472 U.S. at 561. The Supreme Court thereby accepted the funds' reasoning that "records of not-concededly-covered employees are pertinent records because their examination is a proper means of verifying that the employer has accurately determined the class of covered employees." Id. at 566 (internal quotations omitted). The Supreme Court identified

8

two legitimate purposes of the audit: "the concern for fully informing participants of their rights and status under a plan and the concern for assuring the financial integrity of the plans by determining the class of potential benefit claimants and holding employers to the full and prompt fulfillment of their contribution obligations." Id. at 574.

Courts have found proposed audits to be illegitimate when an audit would not serve those two purposes. Thus, funds have been denied the right to audit payroll records when the requested payroll records would not lead to the discovery of unfunded liabilities. For instance, in Trustees of Michigan Regional Council of Carpenters Employee Benefits Fund v. Exhibit Works, Inc. ("Exhibit Works"), a district court held trustees were not entitled to review the payroll and wage-related records of employees who were "employed and doing work outside the geographic jurisdiction of the CBA, who by definition are not covered by the CBA," because "failing to identify the work performed by such employees has no potential to create unfunded liabilities." 868 F. Supp. 2d 592, 594, 603 (E.D. Mich. 2012).

The Exhibit Works court distinguished Central States, in which "the entire universe of employees whose records the trustees sought to review had the potential, depending on their job description and status, to be covered under the plans." Id. at 603; see also Central States, 472 U.S. at 562 ("Under these [CBAs], each employer must make weekly contributions to Central States for each employee who performs work covered by the collective-bargaining agreement."). Thus, the records of all employees in Central States "had the potential to unearth unidentified plan participants who would have valid claims against the funds for benefits but for Central States mistaken classification of 'covered employees.'" Id. at 603.

Likewise, in Bensi v. El Camino Hospital ("Bensi"), trustees sought to examine a hospital's cash disbursement journals, arguing the journals were necessary to generate a list of

9

subcontractors who performed bargaining unit work. 2012 WL 607979, at *1, 4 (N.D. Cal. Feb. 24, 2012). In holding the trustees were not entitled to the journals, the court found that even if the journals showed work had been done by subcontractors, it would not affect the hospital's contribution obligations because the hospital was not required to contribute to the fund for work performed by subcontractors. Id. at *8.

Finally, in Wojciechowski v. Boening Brothers, Inc. ("Wojciechowski"), trustees sought to inspect an employer's disbursements journals reflecting payments made to non-bargaining unit employees and independent contractors. 2012 WL 912968, at *7 (E.D.N.Y. Mar. 16, 2012). But under the CBA, the non-bargaining unit employees were permitted to perform bargaining unit work. Id. The court held the trustees were not entitled to inspect the journals, finding "if the Funds were to discover that [the employer] made cash disbursements to non-bargaining unit employees for their performance of bargaining unit work, plaintiffs fail to explain how such discovery would lead to the conclusion that those employees were mis-classified and, ultimately, that [the employer] should have made contributions for them." Id.

In two of those cases, the district courts also rejected the proposed audits because the plans at issue defined coverage based on the type of worker, rather than the type of work performed. In Bensi, the CBA covered "all Engineers employed by the Hospital." 2012 WL 607979, at *9. Thus, there was no need to look at "who was doing what type of work to find out who was covered"—the covered population was "simply all those who belong to the Union and work in the Hospital." Id. Thus, the court refused the trustees' explanation that they needed the journals to independently verify the hospital's contributions to the fund. Id.

Similarly, in Wojciechowski, the CBA only obligated the employer to contribute to the funds on behalf of "regular employees," who were defined, in part, as bargaining unit members.

10

2012 WL 912968 at *7. The non-bargaining unit employees and independent contractors thus could not "possibly meet the definition of 'regular employees.'" Id. Accordingly, the court held the disbursements journals would not allow the funds to identify plan participants or beneficiaries. Id.

    B.    <u>Application</u>

The Fund has presented evidence that it requires the payroll information of all registered nurses, including those not in the collective bargaining unit. The CBA includes several exceptions to the types of covered registered nurses. Thus, the records of all registered nurses are required to determine whether Nyack is accurately reporting the membership of the class.[2]

However, the Fund has not presented evidence that its proposed audit of all of Nyack's employees, as opposed to just Nyack's registered nurses, would further its two alleged purposes: (i) to determine whether Nyack was accurately reporting the duties and status of its employees, and thereby verify that all required contributions are being made on behalf of covered employees; and (ii) to identify all plan participants and beneficiaries and make them aware of their status and rights under the plan.

As to the Fund's first alleged purpose, there is no evidence that an audit of all of Nyack's employees' payroll records, as opposed to just registered nurses, would lead to the discovery of unfunded liabilities. Only registered nurses are permitted to join the plan, and Nyack is only responsible for contributing to the Fund on behalf of covered employees (who must be registered

---

[2]    Indeed, Nyack appears to concede that the Fund's request to audit the records of registered nurses not in the bargaining unit is reasonable, as it states in its memorandum of law in support of its motion that it "has demonstrated its willingness to consider an audit beyond the bargaining unit but limited to RNs." (Doc. #74 at 19).

nurses). Thus, like in Exhibit Works, Bensi, and Wojciechowski, reviewing the payroll records of employees who are not registered nurses could not affect Nyack's contribution obligations.

Regarding the Fund's second alleged purpose, there is no evidence the payroll records of non-registered nurses would allow the Fund to identify additional plan participants. Like in Bensi, the CBA defines the scope of covered employees by the type of worker—registered nurses—rather than the type of work performed. The CBA covers "all full-time, regular part-time and per diem registered professional nurses employed by the Hospital," with some exceptions. (CBA § 1). The CBA further sets out two types of employees who could meet that description, neither of which expands the CBA's coverage beyond registered nurses: (i) "every person lawfully authorized by permit to practice as a registered professional nurse," and (ii) "every person employed in a position which requires a registered professional nurse." (Id.). Those categories, by definition, require the employee to be a registered professional nurse. Thus, the payroll records of all registered nurses are sufficient to allow the Fund to determine all eligible employees.

Accordingly, the Fund is entitled to audit the payroll records of all of Nyack's registered nurses, but not entitled to audit the payroll records of all of Nyack's employees.

## CONCLUSION

The Fund's motion for summary judgment is GRANTED IN PART and DENIED IN PART.

Nyack's cross-motion for summary judgment is GRANTED IN PART and DENIED IN PART.

All counsel shall appear for a status conference on October 30, 2019, at 3:30 p.m., to discuss Nyack's proposed application for attorney's fees pursuant to 29 U.S.C. § 1332(a) and next steps in this case.

The Clerk is instructed to terminate the motions. (Docs. ##58, 70).

Dated: September 27, 2019
       White Plains, NY

SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge